LESTER J. WORKMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Workman v. Commissioner
Docket No. 1054-71.
United States Tax Court
T.C. Memo 1973-241; 1973 Tax Ct. Memo LEXIS 45; 32 T.C.M. (CCH) 1126; T.C.M. (RIA) 73241; October 29, 1973, Filed *45 Lester J. Workman, pro se. Andrew H. Weinstein, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for 1959, 1961, 1962, and 1963 and additions to tax under section 6653(a) [1] for each of those years as follows: 2 Year
Deficiency
Addition to Tax (Sec. 6653(a)) 1959
$41,116.98
$2,055.84
1961
1,340.42
67.02
1962
1,396.86
69.84
1963
1,741.45
87.07
At the trial and in the briefs filed by the parties, several issues placed in dispute by the pleadings were conceded. [2] The only issues remaining for decision are as follows: *46 3 1. Whether petitioner realized constructive dividend income in 1961, 1962, and 1963 from Industrial Trends Corporation as a result of that corporation's payment of (a) travel, entertainment, hotel, and automobile expenses incurred by petitioner in seeking new business opportunities and (b) certain living and miscellaneous expenses incurred by petitioner; and 2. Whether petitioner is liable for additions to tax under section 6653(a) for 1959, 1961, 1962, and 1963. FINDINGS OF FACT GENERAL Lester J. Workman (hereinafter referred to as "petitioner") was a resident of Mexico at the time his petition was filed with this Court. He filed separate Federal income tax returns for 1959 and 1961 with the district director of internal revenue, Newark, New Jersey. He and his wife, Ann Workman, filed joint Federal income tax returns for 1962 and 1963 with the same district director of internal revenue. Ann Workman is not a party to this proceeding. 4 Issue 1. Constructive Dividends On July 1, 1959, petitioner caused Industrial Trends Corporation (hereinafter "Trends") to be incorporated under the laws of the State of New Jersey. Following its incorporation, petitioner *47 assigned Trends as a loan two notes totaling $200,000 which he had received from the sale of other business interests. On an unspecified date after the period in controversy, Trends was dissolved. During the period of its existence, Trends had the following officers and directors: Name
Officer's Title
Director
Relationship to Petitioner Lester J. Workman
President
Yes
Donald S. Workman
Secretary
Yes
Son
Marjorie Workman Heller
Assistant Secretary
Daughter
Sandra C. Workman
Yes
Former wife
All the stock was owned by petitioner. Petitioner incorporated Trends and made the loan to it with the expectation that it would engage in various business endeavors. Throughout the period here in controversy, petitioner made continuous efforts to find businesses in which Trends could successfully engage. 5 In 1960 petitioner, using Trend's funds, built a house in Sarasota, Florida, which he and his first wife Sandra C. Workman, occupied as their home. On September 28, 1961, they were divorced, and the house was then sold. The proceeds from the sale were reflected in Trend's income tax return. Following the sale of that house, petitioner *48 decided that Trends should enter the general contracting business in Sarasota, and he obtained class C, general contractor licenses from the city for April-September 1963 and for October 1963-September 1964. In carrying on its construction work, Trends used the trade name "Quality Homes Division." Petitioner arranged for the corporation to obtain printed construction agreement forms for use in contracting to carry out construction work, and he maintained a telephone for use in the business. Trends built two houses. The first house was located on South Lockwood Ridge Road.It had five rooms - including two bedrooms - and a two-car garage. Adjoining the garage were a small office and a workshop. Petitioner had hoped the house would be sold before it was finished in 1962. However, since the house had not been sold, petitioner moved into it so that he could avoid having to rent an apartment, and he put a "for sale" sign in the front yard. The sign 6 remained there continuously for the first 6 months and "off and on" for the next year and a half, but petitioner still could not sell the house. The house was built on a lot that belonged to petitioner and was constructed with *49 funds he received from a mortgage taken out on the house. Trends made the mortgage payments during the period in controversy and carried the house as an inventory item it its income tax returns. In addition to serving as petitioner's residence, the house was used as the corporation's headquarters. The only telephone number ever listed at that address (hereinafter "the Lockwood Ridge listing") was carried in petitioner's name in the local telephone directory. Although Trends never had a separate telephone listing or number of its own, this number was used on the construction agreement forms prepared for use by the corporation. The second house was built by Trends for a client pursuant to a construction agreement. During the period the house was being constructed, petitioner kept a sign on the property stating that the house was being built by Quality Homes Division of Trends. The Lockwood Ridge listing was given as the corporation's telephone number. The corporation undertook no other construction work. 7 During 1961, 1962, and 1963, petitioner traveled to Mexico to examine several other business opportunities for Trends. He anticipated that it might be necessary to *50 organize a Mexican corporation to operate a business in Mexico and that 50 percent of the stock in the corporation would be owned by a Mexican. During these trips to Mexico, petitioner explored the possibilities of manufacturing enameled trays for export to the United States, raising chickens, manufacturing ballpoint pens, refining used crankcase oil, and manufacturing stainless steel equipment for kitchens. In 1963 Trends purchased a boat and, in partnership with an experienced fisherman, engaged in the commercial fishing business. Later Trends bought a larger boat which was used for commercial fishing off the shores of Mexico. None of these ventures proved feasible. Trend's funds were used to pay for the travel, entertainment, hotel, and automobile expenses which petitioner incurred in seeking business opportunities for Trends. It also paid for the telephone and utility expenses incurred at petitioner's South Lockwood Ridge Road residence during 1961, 1962, and 1963. In its income tax returns for the fiscal years July 1 of the previous year through June 30 of 1962, 1963, and 8 1964, Trends claimed deductions for the travel, entertainment, hotel, and automobile expenses *51 petitioner incurred in seeking business opportunities and for the amounts it paid for petitioner's utilities and telephone. In those June 30, 1962 through 1964 returns, respectively, Trends also claimed deductions for sales promotion, dues and subscriptions, and real estate taxes. Respondent determined that portions of those amounts were not deductible by Trends. Further, respondent determined that the following amounts of the denied deductions were constructive dividends to petitioner during each of the periods listed: 1961 Travel & Entertainment
$2,510.21
Hotels
132.64
Utilities
206.18
Automobile
904.28
Sales Promotion
35.36
Telephone
163.32
Total
[1] $3,951.53 9 1962 Travel & Entertainment
$2,823.25
Hotels
203.00
Utilities
162.05
Automobile
426.41
Dues & Subscriptions
28.62
Telephone
229.50
Total
$3,872.83 January 1 - June 30, 1963 Travel & Entertainment
$ 1,321.32
Hotels
131.10
Utilities
152.18
Automobile
586.76
Telephone
253.21
Total
[2] $2,444.57
*52 July 1 - December 31, 1963 Travel & Entertainment
$1,647.93
Utilities
189.45
Automobile
1,041.73
Real Estate Taxes
351.01
Telephone
231.19
Total
$3,461.31 10 Issue 2. Section 6653(a) Addition to Tax In his 1959 income tax return, petitioner did not report interest in the amount of $2,058.89 earned on 9 savings accounts. He omitted from his 1961 and 1962 returns cash dividends in the respective amounts of $830 and $1,357. In addition, in his 1961, 1962, and 1963 returns, petitioner improperly deducted $375, $1,300, and $1,300, respectively, as alimony. Although petitioner's returns for all 4 years - 1959, 1961, 1962, and 1963 - were prepared by an accountant, petitioner supplied the information used by the accountant. The records which he maintained did not clearly distinguish between his own transactions and those of his wholly owned corporation, Trends. OPINION 1. Constructive Dividends There is no issue as to whether petitioner traveled in Mexico and elsewhere during 1961, 1962, and 1963 in pursuit of business opportunities. The expenses - travel, entertainment, hotel, and automobile - which he incurred in such pursuits were paid *53 and, in its tax returns, deducted by Trends. Respondent disallowed those deductions by Trends and 11 determined that the expenditures "enured to the personal benefit of petitioner" and represented constructive dividend income to him. Respondent further determined that the expenses "were capital expenditures of petitioner individually and not capital expenditures" of Trends. Thus, the question is whether petitioner incurred the expenses seeking business opportunities for himself or for his corporation. We think a preponderance of the evidence supports petitioner's contention that he was looking for business endeavors in which Trends could engage. He so testified. His testimony is corroborated by the fact that he assigned to Trends notes in the amount of $200,000 shortly after it was incorporated, apparently before any concrete plans had been formulated as to what kind of business was to be undertaken. Efforts were made for Trends to engage in house construction work, and two different commercial fishing ventures were tried. The investigations in Mexico were undertaken as part of an effort to locate other business opportunities for Trends. We hold that respondent erred *54 in his determinations that the payment by Trends of the travel, entertainment, hotel, and automobile expenses, described above, were taxable to petitioner as constructive 12 dividends. [3] *55 We uphold respondent's determination that part of petitioner's underpayment of tax was due to negligence. Decisions will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue. ↩
2. Petitioner conceded: (a) That he had unreported interest income of $2,028.89 in 1959; (b) That he had unreported dividend income of $830 in 1961 and $1,357 in 1962; and (c) That he is not entitled to alimony deductions of $375 in 1961 and $1,300 in each of the years 1962 and 1963. Respondent conceded: (a) That petitioner did not receive long-term capital gain of $162,399.05 in 1959 on the liquidation of a corporation; (b) That petitioner did not receive a constructive dividend of $13,668.46 in 1962 in the form of the value of a residential dwelling; and (c) That petitioner did not receive constructive dividends in the form of the fair rental value of a house in the amounts of $900 and $1,800 in 1962 and 1963, respectively. ↩
1. 46-cent error in statutory notice. Correct total is $3,951.99. ↩
2. Amount actually taxed as a dividend to petitioner was limited to $1,313.91 - the corporation's current and accumulated earnings and profits as of June 30, 1963. ↩
3. The following cases relied upon by respondent are not apposite: (C.A. 9, 1966); (C.A. 6, 1961); (C.A. 8, 1956); and , affirmed per curiam (C.A. 9, 1958). As to Trend's payment of petitioner's telephone and utility expenses, the facts are different. During a portion of 1962 and all of 1963, petitioner maintained his residence at the South Lockwood Ridge Road address and, according to his testimony, that house also served as the corporation's headquarters. The record does not show at what point in 1962 he first started using the residence as the corporation's headquarters. Nor does the record show that there was any relationship between these expenses and the corporation's activities. Further, as to the expenses which were incurred while he was using the residence as the corporation's headquarters, there is no evidence in the record on which an allocation can be made between personal and business use. Therefore, respondent's determination that the payment of these expenses in 1961, 1962, and 1963 by Trends was a constructive dividend in each of those years to petitioner must stand. . 13 There is no evidence in the record concerning - and petitioner does not press his claim to deductions for - the other Trends expenses which respondent treated as constructive dividends. We, therefore, hold that petitioner realized constructive dividends from Trend's payments of $35.36 in 1961 labeled "sales promotion," $28.62 in 1962 for dues and subscriptions, and $351.01 in 1963 for real estate taxes. . 2.Section 6653(a) Addition to Tax Petitioner has the burden of proving that no part of the underpayment of his 1959, 1961, 1962, and 1963 taxes was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). SEC. 6653. FAILURE TO PAY TAX. (a) Negligence of Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c) (1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. [4]↩. As reflected in our 14 Findings, petitioner's returns for these years were prepared by an accountant. However, he has offered no evidence to prove that the underpayment of his 1959, 1961, 1962, and 1963 taxes resulted from reliance on his accountant rather than from his own failure to exercise reasonable care in assuring that his returns reflected all his income and did not claim erroneous deductions. , affirmed on this point (C.A. 3, 1971). Moreover, a great deal of the confusion in petitioner's returns was due to his failure to maintain records which clearly separated his personal transactions from those of Trends.